**MARC P. BERGER**
**REGIONAL DIRECTOR**
**Lara S. Mehraban**
**Gerald A. Gross**
**Preethi Krishnamurthy**
**Eric M. Schmidt**
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0116 (Krishnamurthy)**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

                    **Plaintiff,**

        **-against-**

**IN OVATIONS HOLDINGS, INC. and**
**MARK GOLDBERG,**

                    **Defendants.**

---

**COMPLAINT**

**18 Civ. ___ (   )**

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendants In Ovations Holdings, Inc. ("Ovations") and Mark Goldberg ("Goldberg") (together,

"Defendants"), alleges as follows:

**SUMMARY**

1.      From at least 2014 through 2015 (the "Relevant Period"), Defendants Ovations and

Goldberg—a microcap issuer of publicly-traded stock and its chief executive officer, respectively—

issued materially false press releases to fraudulently induce investors to buy Ovations stock.

**VIOLATIONS**

2.      By virtue of the conduct alleged in this Complaint, Defendants engaged in acts, practices, and courses of business that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(b) promulgated thereunder [17 C.F.R. § 240.10b-5(b)].

3.      Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint, and in acts, practices, transactions, and courses of business of a similar type and object.

**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

4.      The Commission brings this action under the authority conferred upon it by Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

5.      The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating Exchange Act Section 10(b) and Rule 10b-5 thereunder, pursuant to Exchange Act Section 21(d)(1) [15 U.S.C. § 78u(d)(1)]; (b) ordering Defendant Goldberg to disgorge the ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)]; (c) ordering Defendants to pay civil money penalties, pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Goldberg from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (e) permanently prohibiting Goldberg from participating in any offering of a penny stock, pursuant to Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and (f) ordering any other relief the Court may deem just and proper.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action under Exchange Act Section 27

[15 U.S.C. § 78aa].

7.      Defendants, directly or indirectly, have made use of the means or instrumentalities of

interstate commerce or of the mails in connection with the transactions, acts, practices, and courses

of business alleged here.

8.      Venue lies in the Eastern District of New York under Exchange Act Section 27

[15 U.S.C. § 78aa]. Among other things, Goldberg lives in the Eastern District of New York, where

Ovations has its principal place of business.

## THE DEFENDANTS

9.      **Ovations,** a Colorado corporation, has its principal office in Middle Village (Queens

County), New York. Formerly known as Marine Exploration, Inc., Ovations originally claimed to be

in the business of searching for salvageable treasure. From approximately September 2017 through

January 2018, Ovations claimed to be entering the business of selling environmental controls and

biochar products to the cannabis industry. Since then, Ovations has claimed to sell water filtration

and purification systems. Ovations' common stock, not currently registered with the Commission, is

quoted under the symbol "INOH" on OTC Link, an interdealer quotation and trade messaging

system operated by OTC Markets Group, Inc. During the Relevant Period, Ovations' common

stock met the definition of a "penny stock" under Exchange Act Section 3(a)(51) [15 U.S.C.

§ 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240. 3a51-1], in part because the stock traded

below five dollars per share.

10.     **Goldberg**, age 61, lives in Middle Village, New York. From at least 2009 through at

least June 2015, Goldberg served as Ovations' CEO or co-CEO. Between 1982 and 2003, Goldberg

was associated with various broker-dealers registered with the Commission.

## FACTS

11.     During the Relevant Period, Ovations issued at least seven false or misleading press releases about its business.

12.     On information and belief, Goldberg, as Ovations' CEO, generated each of these press releases himself and caused Ovations to issue them.

13.     Goldberg did so to fraudulently induce investors to buy shares of Ovations stock so that one or more stock promoters could sell their Ovations shares in the market for a profit.

14.     Goldberg knew or recklessly disregarded the falsity or misleading nature of each of these press releases.

15.     On information and belief, Goldberg received approximately $250,000 in return from one or more stock promoters at least partly for Goldberg's role in issuing Ovations' false or misleading press releases.

### A.     The Press Releases about Licensing Lung Cancer Detection Technology

16.     On June 10, 2014, Ovations issued a press release entitled "In Ovations Holdings, Inc. Announces the Licensing of Technology for Early Detection of Lung Cancer."

17.     On information and belief, Goldberg generated and caused Ovations to issue this press release.

18.     The press release claimed:

> [Ovations] has concluded negotiations for licensing sophisticated sputum cytology technology for early and pre stage detection of lung cancer from Mel Ehrlich, Ph.D., who is also an officer and director of INOH. Dr. Ehrlich has invented, patented, perfected and marketed multiple biomedical and energy efficiency technologies. Pursuant to the license, INOH obtained exclusive rights to market the sputum cytology and related technologies world-wide from Dr. Ehrlich.

4

19.     On July 2, 2014, at approximately 9:25 a.m.,[1] Ovations issued a press release entitled "In Ovations Holdings, Inc. Announces the Immediate Availability of the Early Detection of Lung Cancer Kit."

20.     On information and belief, Goldberg generated and caused Ovations to issue this press release.

21.     The press release claimed:

> [Ovations] is pleased to announce the implementation of the technology using sputum cytology for the early detection of lung cancer, a recognized laboratory procedure similar to the 'Pap' test. Mel Ehrlich, Ph.D. stated, 'I am pleased with the diligent efforts that [Ovations] is implementing with the sputum cytology technology for the early detection of lung cancer.'

22.     In reality, Dr. Ehrlich never served as an officer or director of Ovations, as Goldberg knew from his position as Ovations' CEO.

23.     Nor did Ovations ever provide any funding to Dr. Ehrlich under its licensing agreement in order to obtain rights to his technology, as Goldberg similarly knew.

24.     On June 30 and July 1, 2014, the two days before Ovations issued its July 2 press release, and on July 2, 2014, no shares of Ovations' common stock traded in the market.

25.     On July 3, 2014, the day after Ovations issued the press release, approximately 9.95 million Ovations shares traded in the market.

**B.      The Press Releases about Acquiring a Wholly-Owned Subsidiary**

26.     Less than seven months later, on January 20, 2015, at approximately 8:50 a.m., Ovations issued a press release entitled "In Ovations Holdings, Inc. Acquires NBE Financial Network, Inc. With Close to 1 Million Dollars in Annual Revenues Through Management of Several Locations in Four States."

---

[1]      All times alleged in this Complaint reflect Eastern Standard or Eastern Daylight Time.

27.     On information and belief, Goldberg generated and caused Ovations to issue this press release.

28.     The press release claimed:

> [Ovations] has acquired NBE Financial Network, Inc. (NBE) as a wholly owned subsidiary. With nearly $1 million dollars in revenues in 2014, NBE's acquisition by INOH continues the trend of the company's diversification and augments its current holdings with a strong revenue generating network. NBE, managing established offices in Florida, New York, New Jersey and Illinois, is engaged in the operation and management of law offices in these multiple states and is also engaged in the acquisition and management of residential properties.

29.     The press release also quoted Goldberg:

> Mark Goldberg, INOH Co-CEO added, '…In seeking out this relationship and ultimately acquiring NBE as a wholly-owned subsidiary, we consistently kept in mind the feedback from our valued shareholders. By acquiring NBE, a company with nearly $1 million dollars in revenues and a presence in multiple metropolitan areas, we have augmented INOH's holdings in order to balance active, present value with our other holdings of strong future potential.'

30.     In reality, Ovations never acquired NBE Financial Network, Inc. ("NBE") and NBE never became Ovations' subsidiary, as Goldberg knew from his position as Ovations' CEO.

31.     On January 16, 2015, the last trading day before Ovations issued its January 20 press release, approximately 74 million shares of Ovations' common stock traded in the market.

32.     On January 20, 2015, the day Ovations issued that press release, almost four times as many—over 275 million—Ovations shares traded in the market.

33.     On March 16, 2015, at approximately 9:40 a.m., Ovations issued a press release entitled "In Ovations Holdings, Inc.'s Wholly-Owned Subsidiary NBE Financial Network, Inc. Reports Substantial Increases in Revenue."

34.     On information and belief, Goldberg generated and caused Ovations to issue this press release.

6

35.     The press release claimed: "[Ovations'] wholly-owned subsidiary NBE Financial Network, Inc. (NBE) reports revenues of $80,335 for February, 2015, an increase of 31%."

36.     On March 13, 2015, the trading day immediately before Ovations issued its March 16 press release, approximately 47 million shares of Ovations' common stock traded in the market.

37.     On March 16, 2015, the day Ovations issued the press release, over 76 million Ovations shares traded in the market.

38.     The next day, Ovations' trading volume doubled to more than 155 million shares traded.

**C.     The Press Release about Acquiring an Interest in a Multimedia Company**

39.     On March 26, 2015, at approximately 9:26 a.m., Ovations issued a press release entitled "In Ovations Holdings, Inc. Announces Expansion Into Multimedia Production, Network TV Programs, and Advertising – Marketing Services."

40.     On information and belief, Goldberg generated and caused Ovations to issue this press release.

41.     The press release claimed: "[Ovations] has acquired a substantial interest in ASAP Multimedia (ASAP). Since 1987, ASAP has been a leading full service television, web, multimedia and production company and creative agency."

42.     From his position as Ovations' CEO and his discussions with ASAP's president, Goldberg knew that Ovations had never acquired an ownership interest in ASAP. Indeed, Goldberg knew that, in approximately March 2015, Ovations had entered into an agreement with ASAP by which Ovations would obtain an interest in ASAP *in the future* upon Ovations' fulfillment of certain conditions and that Ovations had not in fact fulfilled those conditions.

43.     On March 25, 2015, the day before Ovations issued this press release, approximately 64 million shares of Ovations' common stock traded in the market.

44. On March 26, 2015, the day Ovations issued the press release, over 71.8 million Ovations shares traded in the market.

45. The next day, Ovations' trading volume almost doubled to more than 130 million shares traded.

46. When ASAP's president discovered and read Ovations' March 26 press release, he told Goldberg that ASAP wanted no further association with Ovations.

**D.      The Press Releases About the Tank Farm**

47. On June 10, 2015, at approximately 9:23 a.m., Ovations issued a press release entitled "In Ovations Holdings, Inc. (INOH) Enters Into Letter of Intent on Acquisition of 7.5 Million Gallon Tank Farm Calculated to Value Over $13,000,000 and to Yield Revenues of $1.8 Million Dollars per Year."

48. On information and belief, Goldberg generated and caused Ovations to issue this press release.

49. The press release claimed:

> [Ovations] and 2 Lisa Court Corporation executed a Letter of Intent (LOI) for the purchase and rehabilitation of the Meridian Mid Continent Tank Farm and Terminal (hereinafter 'Tank Farm') located in Meridian, Mississippi. The Tank Farm…, after rehabilitation, will produce an approximate income in excess of $1,800,000 per year and possess a total property/project value of between $13,000,000 and $14,000,000.

50. The press release also announced Goldberg's resignation as co-CEO.

51. On June 25, 2015, at approximately 8:54 a.m., Ovations issued a press release entitled "In Ovations Holdings, Inc. (INOH) Executes Purchase and Sale Contract on Acquisition of 7.5 Million Gallon Tank Farm Calculated to Value Over $13,000,000 and to Yield Revenues of $1.8 Million per Year."

52.     This press release similarly claimed:

> [Ovations] and 2 Lisa Court Corporation executed a formal Purchase and Sale Agreement for the purchase and rehabilitation of the Meridian Mid Continent Tank Farm and Terminal (hereinafter 'Tank Farm') located in Meridian, Mississippi. The Tank Farm…, after rehabilitation, will produce an approximate income in excess of $1,800,000 per year and possesses a total property/project value of between $13,000,000 and $14,000,000. As previously disclosed, 2 Lisa Court Corporation has already committed to provide up to 50% seller financing to [Ovations] on the approximately 20 acre site. Additional financing is expected to come from private offerings and a traditional bank-financed real estate loan.

53.     The press release further claimed: "[W]e are pleased to announce that [Ovations] has welcomed Mr. Ted Doukas [the owner of 2 Lisa Court Corporation] to its Board of Directors. Mr. Doukas is a recognized corporate turn-around specialist and [Ovations] looks forward to receiving his input and expert advice."

54.     In fact, although Goldberg had spoken with Ted Doukas about Ovations' potential purchase of a Mississippi tank farm (for oil storage) owned by 2 Lisa Court, Goldberg never asked Doukas to serve on Ovations' Board of Directors, and Doukas never agreed to do so.

55.     Goldberg thus knew that Doukas had never agreed to join and indeed never joined Ovations' Board of Directors.

56.     Furthermore, on information and belief, Ovations had no reasonable basis for the tank farm income and valuation projections contained in the June 10 and June 25 press releases.

57.     On June 9, 2015, the day before Ovations issued the June 10 press release, approximately 37 million shares of Ovations traded.

58.     On June 10, 2015, the day Ovations issued that press release, almost eight times as many Ovations shares—over 293 million shares—traded.

59.     On June 24, 2015, the day before Ovations issued the June 25 press release, only 580,000 Ovations shares traded.

60.    On June 25, 2015, the day Ovations issued that press release, 346 times as many—over 200 million Ovations shares—traded.

61.    When Doukas learned of Ovations' June 25 press release, he complained to Goldberg that the press release was false. Goldberg claimed that it was a mistake and did not say anything to Doukas to give him the impression that Goldberg was no longer involved with Ovations.

62.    On October 27, 2015, Ovations issued an "Annual Report – Financial Statements" that appeared on OTC Link's website: the first financial report Ovations issued on that website after Ovations' June 25, 2015 press release.

63.    The annual report listed Goldberg as Ovations' chief financial officer, secretary, and director and disclosed that Goldberg "served as CEO since April 2009 and was appointed to the Board of Directors effective May 1, 2010."

64.    The report did not mention Goldberg's resignation as Ovations' CEO.

65.    Goldberg's certification and electronic signature, as chief financial officer, appeared on the annual report.

## CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5(b)

66.    Paragraphs 1 through 65 are realleged and incorporated by reference as if fully set forth herein.

67.    Defendants Ovations and Goldberg, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

68.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Defendants and their agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them who receive actual notice of the final judgment by personal service or otherwise, and each of them, from future violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering Defendant Goldberg to disgorge all ill-gotten gains he received directly or indirectly, with prejudgment interest thereon, as a result of his violations alleged in this Complaint;

### III.

Ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### IV.

Permanently prohibiting Defendant Goldberg from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

### V.

Permanently prohibiting Defendant Goldberg from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading,

or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act

Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

**VI.**

Granting any other and further relief as the Court may deem just and proper.


Dated:  New York, New York
        September 5, 2018


Marc P. Berger
Lara S. Mehraban
Gerald A. Gross
Preethi Krishnamurthy
Eric M. Schmidt
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0116 (Krishnamurthy)
Email: Krishnamurthyp@sec.gov